[Cite as *Smathers v. Glass*, 2020-Ohio-3264.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT


TAMMY SMATHERS, Individually and
on Behalf of the ESTATE of HARMONY
BROOKLYN RAYNE CARSEY

      Plaintiffs-Appellants

-vs-

RICK GLASS, EXECUTIVE DIRECTOR
of PERRY COUNTY CHILDREN'S
SERVICES, et al.

      Defendants-Appellees

JUDGES:
Hon. William B. Hoffman, P. J.
Hon. John W. Wise, J.
Hon. Patricia A. Delaney, J.

Case No. 19 CA 00018

O P I N I O N


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Civil Appeal from the Court of Common Pleas, Case No. 17 CV 278 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | June 8, 2020 |


APPEARANCES:

For Plaintiffs-Appellants

JEREMY M. BURNSIDE
BURNSIDE LAW, LLC
1118 Hutchins Street
Suite A
Portsmouth, Ohio 45662

For Defendants-Appellees

J. STEPHEN TEETOR
MATTHEW S. TEETOR
ISAAC WILES BURCKHOLDER
& TEETOR, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215-5098

*Wise, J.*

{¶1}    Appellant Tammy Smathers, Individually and on Behalf of the Estate of Harmony Brooklyn Rayne Carsey appeals from the October 15, 2019, decision of the Perry County Common Pleas Court granting summary judgment in favor of Appellees Rick Glass, Katie Hursey, Nick Pease and Ben Taylor.

### STATEMENT OF THE FACTS

{¶2}    For purposes of this Opinion, the relevant facts and procedural history are as follows:

{¶3}    In the fall of 2015, Tylor Carsey moved out of the home he shared with his wife Crystal Carsey and their minor children, including Harmony Carsey. (Tylor Carsey Depo. at 23-24).

{¶4}    Following the separation, Perry County Children's Services (PCCS) and Athens County Children Services began receiving complaints about Crystal Carsey from Tylor Carsey. (Tylor Carsey Depo. at 25-26).

{¶5}    The complaints received by PCCS and the contacts PCCS had with the family, actual and attempted, were documented as follows:

{¶6}    On November 12, 2015, an initial complaint was made to Children Services. This call led to Caseworker Nick Pease responding and visiting Crystal Carsey's home on three separate occasions. The Activity Log Report details the following interactions:

{¶7}    The first visit was an attempted visit to the home the next day, November 13, 2015. No contact was made with anyone inside.

{¶8}    Then, on November 15, 2015, Nick Pease and Police Chief Groves made an unannounced, follow-up visit to the home. At this time, Crystal was home and they

were able to make contact. Crystal told Mr. Pease and Chief Groves that Tylor Carsey had moved out and left her and the three children without transportation or their WIC card. According to Mr. Pease, the house was cluttered and there was possibly a hoarding issue, but there was plenty of food in the residence, and they had water and heat. He noted that the refrigerator was broken but that they were storing food outside when it was cold enough and also keeping food at a neighbor's house. Mr. Pease was able to observe all three children and stated they all appeared fine. He did advise the mother to clean up the house and that he would return to check the status. (Affidavit of Nick Pease at 4).

{¶9} On November 20, 2015, Nick Pease returned to Crystal's home. Mr. Pease again was able to confirm that the children were fine and did not appear to be in any immediate danger. He noted that the condition of the house was improved and he encouraged the mother to continue the good work and further offered assistance with Integrated Services and counseling to help with the hoarding issues, which she agreed to accept. (Affidavit of Nick Pease at ¶5).

{¶10} On November 21, 2015, Appellant Tammy Smathers (Tylor Carsey's mother and the grandmother of Harmony Carsey) called Athens County Children Services (ACCS) to report that Harmony had fallen twice while at her home and that she was being taken to O'Bleness Hospital.

{¶11} ACCS then notified Perry County Children Services of same. This call was received by Caseworker Katie Hursey. (Affidavit of Katie Hursey at ¶2; Affidavit of Nick Pease at ¶6).). Caseworker Hursey called O'Bleness Hospital and was notified that Harmony was being transported to Cabell Huntington Hospital in West Virginia for evaluation. Id. Caseworker Hursey then called Cabell Hospital to notify it of the transport.

(Hursey at ¶3). Ms. Hursey was advised by her supervisor that unless a physician reported child abuse or neglect, PCCS did not have enough evidence to intervene. (*Id.* at ¶4).

**{¶12}** Caseworker Hursey followed up with Cabell Hospital at 8:51 pm on that same Saturday night and was advised by Dr. Hensley that all of Harmony's X-rays were negative, that her stomach was slightly distended but that it was likely gas, and that the ultrasound was negative for fluids. (*Id.* at ¶7). Ms. Hursey was also informed that Harmony had been cleared by the trauma team, that while she was thin she was not malnourished, and that she may be discharged the following day. Id. The doctor stated that he would notify Ms. Hursey of any future concerns and when the child would be discharged. *Id.* Ms. Hursey had no further contact with the case.

**{¶13}** On November 24, 2015, Appellant Tammy Smathers made a telephone call to PCCS. At that time, Harmony was still at Cabell Huntington Hospital but was discharged later that same day. Appellant reported that her son Tylor "did get paperwork to file for custody of all 3 children but hasn't filed yet."

**{¶14}** On November 24, 2015, Caseworkers Nick Pease and Ben Taylor went to Crystal Carsey's house but found no one at home. (Affidavit of Nick Pease at ¶7).

**{¶15}** On December 3, 2015, Caseworker Pease made contact with Crystal Carsey by telephone and arranged a home visit for the following day, December 4, 2015. (Affidavit of Nick Pease at ¶8).

**{¶16}** On December 3, 2015, Nick Pease also documented that he called Appellant Smathers and learned from her that she and her son Tylor were taking Harmony to court for formal custody the following day. (See Affidavit of Nick Pease at ¶ 8). Nick

Pease asked Appellant to stop in at the PCCS offices on the way to court and she agreed to do so.

**{¶17}** On December 4, 2015, Caseworkers Pease and Taylor went to Crystal Carsey's house but again found no one home. (Affidavit of Nick Pease at ¶9). Nick Pease also telephoned Crystal later in the day, with no answer. Id.

**{¶18}** On December 4, 2015, Appellant Smathers, Tylor Carsey and Harmony Carsey came to the offices of PCCS. Appellant and Tylor stated they were on their way to court to formalize custody of Harmony. (Affidavit of Nick Pease at ¶9).

**{¶19}** On December 7, 2015, Caseworker Pease attempted a home visit to Crystal Carsey's house and left a letter on the door asking her to call. (Affidavit of Nick Pease at ¶10).

**{¶20}** On December 10, 2015, Nick Pease received a call from Crystal Carsey and a home visit was scheduled. (Affidavit of Nick Pease at ¶11).

**{¶21}** On December 11, 2015, Nick Pease made a home visit to Crystal Carsey. At that time he observed that the living conditions were improving and he again encouraged Ms. Carsey to keep up the good work. Mr. Pease noted that Harmony was present at the home, that she appeared fine, and that her diaper rash was getting better. Ms. Carsey told Mr. Pease that Harmony and the other children had been visiting with their father, Tylor Carsey. Nick Pease asked Crystal for the medical records and she stated that Tylor Carsey may have them. (Affidavit of Nick Pease at ¶12).

**{¶22}** On December 18, 2015, Nick Pease made a home visit with Crystal Carsey. At that time she signed a medical release for Harmony's medical records. Mr. Pease also noted that the residence appeared to be better organized. (Affidavit of Nick Pease at ¶13).

{¶23} On December 18, 2015, PCCS obtained a signed medical release for Harmony Carsey's medical records.

{¶24} On December 22, 2015, PCCS received the medical records from Cabell Hospital.

{¶25} On Christmas Day, Appellant Smathers and Tylor Carsey returned Harmony to Crystal Carsey.

{¶26} On December 30, 2015, a home visit was attempted at Crystal Carsey's home but no one answered the door. A business card was left in the door

{¶27} On January 8, 2016, Harmony Carsey died from dehydration after being left in overheated room without fluids.

{¶28} On November 20, 2017, Plaintiff-Appellant Tammy Smathers, Individually and on Behalf of the Estate of Harmony Brooklyn Rayne Carsey, filed a wrongful death action in the Perry County Court of Common Pleas, naming Perry County Children's Services, Rick Glass, Katie Hursey, Nick Pease and Ben Taylor as defendants.

{¶29} As set forth above, Nick Pease, Ben Taylor and Katie Hursey are all Caseworkers with PCCS. Rick Glass is the Executive Director of Perry County Children's Services.

{¶30} In the Complaint, Appellants alleged four separate Counts: (1) violation of R.C. §2151.421; (2) negligent and reckless misconduct; (3) wrongful death; and (4) violation of Ohio Administrative Code 5101:2-37-02.

{¶31} On July 19, 2018, Defendants-Appellees filed a Motion for Partial Judgment on the Pleadings as to all claims against Perry County Children's Services, Counts I and IV of Plaintiff's Complaint and all negligence claims made by Plaintiff.

**{¶32}** On August 13, 2018, Appellants filed a Memorandum Contra to Appellees' Motion for Partial Judgment on the Pleadings.

**{¶33}** By Judgment Entry filed September 20, 2018, the trial granted Appellees' Motion and dismissed all claims against Perry County Children's Services, Counts I and IV of Plaintiff's Complaint and all negligence claims made by Plaintiff.

**{¶34}** On November 13, 2018, Appellants filed an Amended Complaint alleging that Appellees Rick Glass, Katie Hursey, Nick Pease and Ben Taylor acted with willful indifference and were reckless in failing to investigate allegations that Harmony Carsey was being abused and neglected.

**{¶35}** On June 28, 2019, Appellees Rick Glass, Katie Hursey, Nick Pease and Ben Taylor filed a Motion for Summary Judgment.

**{¶36}** On July 31, 2019, Appellants filed a Response in Opposition to Appellees' Motion for Summary Judgment.

**{¶37}** On August 15, 2019, Appellees filed a Reply in Support of their Motion for Summary Judgment.

**{¶38}** On August 29, 2019, Appellants filed a motion to file a Sur Reply *instanter*, which was granted by the trial court on September 20, 2019.

**{¶39}** On October 3, 2019, Appellees filed a Memorandum Contra to Appellants' Sur Reply.

**{¶40}** By Judgment Entry filed October 15, 2019, the trial court granted Appellees' Motion for Summary Judgment and dismissed Appellants' claims. In said Entry, the trial court found Appellees were immune from liability pursuant to R.C. §2744.02(A)(1).

**{¶41}** Appellant now appeals, raising the following errors for review:

ASSIGNMENTS OF ERROR

{¶42} "I. BECAUSE THE TRIAL COURT DID NOT ADDRESS THE EVIDENCE CONTRADICTING APPELLEES' ASSERTION THAT APPELLANT HAD "CUSTODY" OF HARMONY CARSEY, THE COURT'S DECISION RESTS ON ERRONEOUS FINDINGS OF FACT.

{¶43} "II. THE TRIAL COURT ERRED BY FAILING TO ADDRESS EVIDENCE THAT APPELLEE PEASE HAD ACTUAL KNOWLEDGE OF MULTIPLE PHYSICAL INJURIES TO HARMONY CARSEY, AS WELL AS OTHER SERIOUS HEALTH CONCERNS AT ALL TIMES RELEVANT HEREIN; THAT APPELLEE PEASE DISREGARDED THE DANGEROUS CAGE THAT HARMONY WAS KEPT IN; THAT APPELLEE PEASE DISREGARDED SUBSTANTIAL ADDITIONAL EVIDENCE PROVING THAT HARMONY'S REPEAT CHILD ABUSE MOTHER COULD NOT CARE FOR HER, AND KEPT HARMONY IN DANGEROUS CIRCUMSTANCES; THAT APPELLEE PEASE WANTONLY DELAYED THE PROCESS OF OBTAINING MEDICAL RECORDS DESPITE PCCS BEING ADVISED THAT HARMONY'S HEALTH WAS IN CRISIS; THAT APPELLEE PEASE TOOK NO ACTION AT ALL FOR SEVEN DAYS AFTER RECEIVING "OVERWHELMING" MEDICAL EVIDENCE OF ABUSE AND NEGLECT; AND THAT APPELLEE PEASE WILLFULLY FALSIFIED THE PCCS SAFETY ASSESSMENT PAPERWORK AFTER HE ACQUIRED ACTUAL KNOWLEDGE OF "OVERWHELMING EVIDENCE" OF ABUSE AND NEGLECT OF HARMONY CARSEY.

{¶44} "III. THE TRIAL COURT ERRED BY FAILING TO ADDRESS EVIDENCE THAT APPELLEE GLASS INTENTIONALLY DISMISSED INFORMATION THAT

HARMONY CARSEY HAD BEEN LIFE FLIGHTED TO AN INTENSIVE CARE UNIT FROM NOVEMBER 21, 2015 TO NOVEMBER 23, 2015, OR WANTONLY AND RECKLESSLY REFUSED TO FOLLOW UP ON THAT FACT; THAT APPELLEE GLASS INTENTIONALLY OR WANTONLY FAILED OR REFUSED TO ENSURE THAT HIS STAFF FOLLOWED PCCS AND OHIO POLICIES AND REGULATIONS CONCERNING SAFETY ASSESSMENTS AND PLANS; AND THAT APPELLEE GLASS INTENTIONALLY OR WANTONLY FAILED OR REFUSED TO EXERCISE SUPERVISION OVER HIS AGENCY'S COMMUNICATION, PAPERWORK AND TRAINING REQUIREMENTS.

{¶45} "IV. THE TRIAL COURT ERRED BY FAILING TO ADDRESS EVIDENCE THAT APPELLEE HURSEY WAS ADVISED BY PHYSICIANS AT TWO DIFFERENT HOSPITALS AND SHERIFF'S DEPUTIES THAT HARMONY HAD COLLAPSED DUE TO APPARENT WEAKNESS; THAT HER BODY SHOWED NUMEROUS SIGNS OF ABUSE AND NEGLECT ALSO REPORTED TO HER UPON HER ADMISSION TO THE INTENSIVE CARE UNIT; AND THAT APPELLEE HURSEY WANTONLY OR RECKLESSLY FAILED TO TAKEN ANY ACTION REGARDING HARMONY'S LIFE THREATENING CIRCUMSTANCES.

{¶46} "V. THE TRIAL COURT ERRED BY FAILING TO ADDRESS EVIDENCE THAT APPELLEE TAYLOR INDEPENDENTLY ACQUIRED ACTUAL KNOWLEDGE OF ALL THE SAME FACTS AND CIRCUMSTANCES THAT INDICATED LIFE THREATENING DANGER TO HARMONY CARSEY, BUT WANTONLY OR RECKLESSLY NEVER TOOK INDEPENDENT ACTION TO PREVENT FURTHER HARM OR DEATH.

**{¶47}** "VI. THE TRIAL COURT ERRED BY COMPLETELY FAILING TO ADDRESS THE EXTENSIVE AND DETAILED FACTUAL FINDINGS AND CONCLUSIONS REGARDING APPELLEES' KNOWLEDGE OF DANGEROUS FACTS AND CIRCUMSTANCES, AND APPLICATIONS TO THE RELEVANT LEGAL STANDARDS SUBMITTED BY APPELLANTS' EXPERT DR. J.J. CLARK AND THE OPINIONS OF EXPERT DR. C. JEFF LEE REGARDING HOW LONG HARMONY'S INJURIES WOULD HAVE BEEN VISIBLE AFTER SHE WAS DISCHARGED FROM THE INTENSIVE CARE UNIT."

## STANDARD OF REVIEW

**{¶48}** Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987). As such, this Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

**{¶49}** Civ.R. 56 provides summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

**{¶50}** It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477

U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1987). The standard for granting summary judgment is delineated in *Dresher v. Burt*, 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): "* * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56 which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56 to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ*, 37 Ohio St.2d 150, 309 N.E.2d 924 (1974).

## I.

**{¶51}** In their first assignment of error, Appellants argue the trial court's finding that Harmony Carsey was in the custody of her father and Appellant Tammy Smathers for the period of time between Thanksgiving and Christmas is based on erroneous findings of fact. We disagree.

**{¶52}** When considering trial court's findings of fact, this Court defers to the trial court. *Brown v. Brown*, 2017-Ohio-8938, 102 N.E.3d 72, ¶ 20 (3rd Dist.). A reviewing court will not disturb the trial court's decision if it is supported by competent, credible evidence. *Cliffs and Creeks,* 2018-Ohio-5410, ¶ 12 citing *Bayes v. Toledo Edison Co.*, 6th Dist. Nos. L–03–1177, L–03–1194, 2004-Ohio-5752, 2004 WL 2426234, ¶ 69; *Gans v. Andrulis*, 11th Dist. No. 99-P-0118, 2001 WL 530490, *4-5 (May 18, 2001); *Munchmeyer v. Burfield*, 4th Dist. No. 95CA7, 1996 WL 142579, *3 (Mar. 26, 1996); *Murray v. Lyon*, 95 Ohio App.3d 215, 219, 642 N.E.2d 41 (9th Dist.1994). *See also Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir.2008); *Delaware Golf Club, LLC V. Dornoch Estates Homeowners Association, Inc., et al.*, 5th Dist. Delaware No. 19 CAE 04 0027, 2020-Ohio-880.

**{¶53}** Upon review, we find that the record supports the trial court's finding that Harmony Carsey was in the physical custody of Tylor Carsey and Appellant Tammy Smathers for the time period between the child's discharge from the hospital and her return to Crystal Carsey's house on or about Christmas day.

**{¶54}** On November 21, 2015, the day that Harmony fell and was taken to the hospital, she was with Appellant Smathers. (Tammy Smathers Depo. at 34, 37-38). Upon her discharge from the hospital on November 24, 2015, Harmony was taken to live with her father and Appellant Smathers. (*Id.* at 43). She remained there until Christmas Day. (*Id.* at 45).

**{¶55}** During a telephone call with Nick Pease on December 3, 2015, Appellant Smathers stated that she and her son were looking into custody of Harmony. *Id.* She stated that she and Tylor were going to the courthouse the following day to file the

necessary paperwork for custody. *Id.* Arrangements were made for Appellant and Tylor to come to PCCS' offices while in New Lexington. *Id.*

**{¶56}** On December 4, 2015, Appellant Smathers and Tylor did come to the office to meet with Mr. Pease and Ben Taylor. (Smathers Depo. at 50-54; Affidavit of Nick Pease at ¶9). They had Harmony with them at this meeting and again informed PCCS that they were going to court that day to finalize custody. *Id.* PCCS explained to Appellant and Tylor Carsey that because Tylor and Crystal were still married, he had just as much right to custody of the children as their mother did. (Smathers Depo. at 54).

**{¶57}** During the meeting, Appellant told Nick Pease and Ben Taylor that Harmony's hair was growing back. Caseworker Pease asked for the medical records from Cabell Hospital but was told by Tylor that Crystal might have them.

**{¶58}** In her deposition, Appellant Tammy Smathers testified that Harmony was with her and Tylor from Thanksgiving until Christmas. (Smathers Depo. at 45-47, 64, 68). She further testified that she never talked to Nick Pease after her meeting at PCCS, which took place around Thanksgiving. (*Id.* at 60-61). She stated that she did not make any complaints during that month because Harmony was with her. (*Id.* at 65). Appellant Smathers stated that the child was doing "awesome" and "she was doing so good" while she was with her during that month. (*Id.* at 46). She stated that on Christmas Day, Tylor allowed Crystal to take Harmony back to her house. (*Id.* at 48, 64). She said the plan was to switch the kids back and forth between the parents and that she was supportive of the decision. (*Id.* at 48).

**{¶59}** She also admitted that she and Tylor could have kept Harmony with them rather than return her to Crystal Carsey as they had as much legal right to the children as Crystal did. (*Id.* at 69).

**{¶60}** As set forth above, Appellees were informed and believed that Harmony was in the custody of her father and Appellant Smathers from the time she was discharged from the hospital. Both Tylor Carsey and Appellant testified in their depositions that Harmony was with them until Christmas. Appellees were never informed that Tylor Carsey and/or Appellant returned Harmony to her mother on Christmas Day. (Smathers Depo. at 65). PCCS received no complaints concerning Harmony between Thanksgiving and her death on January 8, 2016.

**{¶61}** While Appellant Smathers argues that she submitted an Affidavit that contradicted some of her deposition testimony, the trial court considered her deposition testimony which was taken June 22, 2018, as opposed to the statements she made in her Affidavit on July 16, 2019. However, the trial court noted that the statements in the affidavit did not refute her testimony that Harmony was with her from her discharge from the hospital until approximately Christmas. The court also noted that Appellant does not deny that neither she nor Tylor notified Appellees that they had returned Harmony to her mother. (October 15, 2019, Summary Judgment Entry at 2-3).

**{¶62}** Based on the foregoing, we find that the trial court's factual findings that Harmony Carsey was in the custody of her father and Appellant Smathers from on or about Thanksgiving until Christmas is supported by competent, credible evidence, and will not be disturbed by this Court.

**{¶63}** Appellants' first assignment of error is overruled.

**II. - V.**

**{¶64}** Appellants have not separately addressed their arguments for Assignments II through V, and have instead addressed them as one. This Court shall do the same.

**{¶65}** In their second, third, fourth and fifth assignments of error, Appellants argue that the trial court erred in not finding Appellees willful, wanton and reckless actions caused the death of Harmony Carsey. We disagree.

*Political Subdivision Employee Immunity*

**{¶66}** In an action against an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by an act or omission in connection with a government or proprietary function, the employee is immune unless: (a) the acts or omissions were manifestly outside the scope of the employee's employment; (b) the acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed by a statute. R.C. §2744.03(A)(6)(a)-(c).

**{¶67}** Subsection (b) is the only section alleged to be pertinent here as Appellants argue that each employee's behavior was wanton and reckless. Recklessness in this context is a perverse disregard of a known risk. *O'Toole v. Denihan,* 118 Ohio St.3d 374, 889 N.E.2d 505, 2008-Ohio-2574, ¶ 73. It necessarily requires something more than mere negligence as the actor must be conscious that his conduct will in all probability result in injury. *O'Toole,* 118 Ohio St.3d 374 at ¶¶ 3, 74, 889 N.E.2d 505.

**{¶68}** "Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a

disposition to perversity." *Id.* at ¶ 75, 889 N.E.2d 505 (upholding summary judgment and granting immunity to agency employees in a case where a child died from abuse). The Supreme Court has warned that a determination of recklessness regarding children services employees is to be conducted without using 20–20 hindsight and without emotional consideration. *Id.* at ¶ 76, 889 N.E.2d 505.

{¶69}  The Ohio Supreme Court has set forth the definitions of reckless, willful, and wanton misconduct as it relates to immunity. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266. The court said:

{¶70}  Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. [*Tighe v. Diamond*, 149 Ohio St. 520, 527, 80 N.E.2d 122 (1948)]; *see also Black's Law Dictionary* 1630 (8th Ed.2004) (describing willful conduct as the voluntary or intentional violation or disregard of a known legal duty).

{¶71}  Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. [*Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977)]; *see also Black's Law Dictionary* 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

{¶72} Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Thompson v. McNeill*,

53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990), adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); *see also Black's Law Dictionary* 1298-1299 (8th Ed.2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

**{¶73}** Appellants, in their Amended Complaint, alleged willful indifference and recklessness on the part of Appellees.

**{¶74}** Here, the trial court found no genuine issues of material fact as to whether the four individual Appellees acted with willful indifference or recklessness in the performance of their duties.

**{¶75}** The trial court found that on their visits to Crystal Carsey's home, Appellees saw no evidence of abuse or neglect. No immediate threat of serious harm was noted in either the November 16th or December 4th visits where Harmony was present. PCCS provided a playpen to the family and offered to help them obtain a replacement refrigerator.

**{¶76}** While PCCS was notified that Harmony had been taken to the hospital, it did not receive the hospital records indicating suspected neglect or abuse until December 22, 2015. Further, Appellees were informed and believed that Harmony was in the custody of her father and Appellant Smathers from the time she was discharged from the hospital. Both Tylor Carsey and Appellant testified in their depositions that Harmony was with them until around Christmas. Appellees were never informed that Tylor Carsey and/or Appellant Smathers returned Harmony to her mother on Christmas Day. PCCS

received no complaints concerning Harmony between Christmas and her death on January 8, 2016.

**{¶77}** In *O'Toole,* the Supreme Court ruled in favor of an intake supervisor who was very involved in the caseworker's investigation and who admitted supervisory error in allowing the child to remain with the person who ended up killing her. *O'Toole,* 118 Ohio St.3d 374, 889 N.E.2d 505. Still, the Court held that there was no genuine issue of material fact as to recklessness and that any mistakes or violations of administrative code sections or violations of agency policies did not rise to the level of recklessness. *Id.*

**{¶78}** Here, based on the facts as set forth above, we find Appellees' conduct does not rise to the level of recklessness.

**{¶79}** While Appellants argue that the trial court failed to address certain evidence in its Judgment Entry, a trial court is not required to provide the reasons for its decision regarding the summary judgment motions. *See* Civ.R. 52.

**{¶80}** In conclusion, we find the trial court did not err in finding that all of the Appellees should be granted immunity because there was no showing through actual summary judgment evidence that there was a genuine issue of material fact as whether any of them acted maliciously, in bad faith, wantonly, or recklessly. Appellants have provided no evidence that any of the Appellees consciously left the child in a situation with the knowledge that further injury was a substantial certainty. *See O'Toole,* 118 Ohio St.3d 374 at ¶ 78, 889 N.E.2d 505.

**{¶81}** Appellants' second, third, fourth and fifth assignments of error are overruled.

**VI.**

**{¶82}** In their sixth and final assignment of error, Appellants argue the trial court failed to consider the opinions of her expert witnesses that were attached to their brief in opposition to summary judgment. We disagree.

**{¶83}** The affidavits in question were from Dr. J.J. Clark and Dr. C. Jeff Lee. In his affidavit, Dr. Clark opined that Appellees' conduct was reckless and egregious.

**{¶84}** Dr. Lee presented his opinion that several of the injuries present at Harmony's death would have been present and visible when Caseworker Nick Pease saw her in December.

**{¶85}** Appellants argue that the trial court erred in failing to mention and/or consider the opinions of these experts. Again, as stated above, the trial court is not required to list all of its reasons in support of its decision to grant summary judgment. *See* Civ.R. 52.

**{¶86}** Further, although a plaintiff can find an expert to state in an affidavit that an act was reckless, it does not mean that there is a genuine issue for trial as to whether the Appellees lost their immunity due to recklessness. *Lindsey v. Summit Cty. Children Servs. Bd.,* 9th Dist., Summit County No. 24352, 2009-Ohio-2457; *Hackathorn v. Preisse,* 104 Ohio App.3d at 772, 663 N.E.2d 384. *See also Pope v. Trotwood–Madison City Sch. Dist. Bd. of Edn.,* 2d Dist. No. 20072, 2004–Ohio–1314, ¶ 17.

**{¶87}** Contrary to Appellants' claims, these affidavits do not create any issues of material fact. Affiants' statements that Appellees were reckless were legal conclusions, not factual statements. Appellees' level of culpability is a legal issue and determination of recklessness is a matter for the trier of fact.

**{¶88}**  Appellants' sixth assignment of error is overruled.

**{¶89}**  For the reasons stated in the foregoing opinion, the decision of the Court of Common Pleas of Perry County, Ohio, is affirmed.


By: Wise, J.

Hoffman, J., and

Delaney, J., concur.



JWW/k