[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Smathers v. Glass*, Slip Opinion No. 2022-Ohio-4595.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4595

SMATHERS, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CARSEY, APPELLANT, *v*. GLASS, EXECUTIVE DIR., ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Smathers v. Glass*, Slip Opinion No. 2022-Ohio-4595.]**

*Torts—Summary judgment—When resolving a case on summary judgment, the trial court does not weigh the evidence in the case—When reviewing a grant of summary judgment, a court of appeals does not defer to the trial court's determinations but reviews the evidence de novo—R.C. Chapter 2744— When determining government employees' liability under R.C. 2744.03 on a motion for summary judgment, a court determines not whether the employees acted in a reckless or wanton manner but whether reasonable minds could find that they acted in such a manner when the facts presented are viewed in a light most favorable to the nonmoving party.*

(No. 2020-1062—Submitted October 26, 2021—Decided December 22, 2022.)

APPEAL from the Court of Appeals for Perry County,

No. 19 CA 00018, 2020-Ohio-3264.

**BRUNNER, J.**

**{¶ 1}** In 2018, Ohio children's-services agencies investigated over 100,000 reports of abuse, neglect, or dependency of children and families in need of services. Public Children Services Association of Ohio, *Factbook* (14th Ed.2019), https://www.pcsao.org/pdf/factbook/2019/StateOfOhioProfile.pdf (accessed Nov. 30, 2022) https://perma.cc/S9N2-WSQF. The caseworkers tasked with ensuring the safety and well-being of Ohio's children face some of the biggest challenges in our communities: addiction, mental-health disorders, poverty, and trauma. R.C. 2744.03 protects government employees, including children's-services workers, from accusations of negligence in the course of performing their duties.

**{¶ 2}** This law recognizes that a court should not use hindsight to judge the difficult decisions made by children's-services workers. But the law does not shield children's-services workers from suit for conduct that goes beyond negligence— for instance, when there is evidence that a caseworker's act, or failure to act, would constitute a reckless disregard for a child's safety and welfare or would be substantially likely to lead to a child's being harmed. The statute providing immunity to government workers balances the need to protect children's-services workers so that they may do their job without fear of being sued against the need to ensure that children are not harmed because of a children's-services worker's wanton or reckless conduct.

**{¶ 3}** Whether immunity applies to children's-services workers accused of harming or causing the death of a child is an issue that appropriately may be decided on a motion for summary judgment. *See O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 75. A court making that determination must look at the evidence and determine whether it is so one-sided that the party claiming immunity should prevail as a matter of law. *See Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993). Because this determination requires an

application of the immunity statute to undisputed facts, the court must be careful not to step into the role of fact-finder. Indeed, it is often observed that the purpose of summary judgment is "not to try issues of fact, but rather to determine whether triable issues of fact exist." *See Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 15, 467 N.E.2d 1378 (6th Dist.1983).

{¶ 4} We conclude that the trial court in this matter erred by acting as a fact-finder on a motion for summary judgment. In turn, the Fifth District Court of Appeals applied the wrong standard when it reviewed the trial court's decision and gave deference to the trial court's factual findings. We conclude that the evidence presented to the trial court in this case was not dispositive of the question of immunity for the children's-services workers. Therefore, summary judgment was not appropriate. We therefore reverse the court of appeals' judgment and remand this cause to the trial court so that the questions of fact may be resolved at trial.

## I. Background and procedural history

{¶ 5} Harmony Carsey was two years old when she died on January 8, 2016, at her mother's home. In November 2017, appellant, Tammy Smathers, Harmony's paternal grandmother, brought a wrongful-death action against Perry County Children's Services ("PCCS") and appellees, PCCS's executive director, Rick Glass, and caseworkers Katie Hursey, Nick Pease, and Ben Taylor (collectively, "agency employees").

{¶ 6} PCCS was dismissed from the case based on political-subdivision immunity, and Smathers filed an amended complaint. The amended complaint alleged that the child's death was the result of willful and reckless misconduct by the agency employees. In June 2019, the agency employees moved for summary judgment. They claimed that as children's-services workers, they are immune from liability unless their conduct amounted to a perverse disregard of a known risk. They also argued that there was no evidence in the record that would permit a reasonable jury to find that they had caused injury to Harmony.

## A. Evidence before the trial court

{¶ 7} At the time of Harmony's death, PCCS was involved with Harmony's family, investigating allegations of neglect and abuse in her mother's home. In her affidavit in support of her memorandum opposing summary judgment, Smathers stated that she had been concerned that Harmony's mother, Crystal Carsey, was keeping Harmony in a cage in a very hot room, without water, on the second floor of Crystal's house, and that she "did not know how Crystal was keeping Harmony upstairs," because the child "was old enough to be able to climb out of the cage." Smathers claimed that she reported these concerns to PCCS at some point between November 12, 2015, and January 1, 2016. Hursey's deposition testimony tends to support Smathers's claim. Hursey testified that she "screened in," or answered, an incoming telephone call regarding Crystal on November 12, 2015, in which the caller reported, among other things, that a two-year-old was being kept in a second-floor bedroom because her mother could not handle her and that the house was a "total disaster." Hursey's case notes summarizing that call state, "The 2-year-old is kept in a bedroom upstairs because [natural mother] cannot handle her, it is unknown how the child is kept in the room."

{¶ 8} The parties do not dispute that Harmony's parents were not equipped to make good decisions or provide for the best interests of their children. Smathers acknowledged in her deposition that her son, Harmony's father, Tylor Carsey, had become addicted to Percocet after being injured in a car accident and that he and Crystal fought a lot. She also stated that she did not think that Crystal was a very good mother and that she thought Crystal was using drugs. Smathers explained that she had gained legal custody of Tylor and Crystal's first child after they failed to "get their crap together."

{¶ 9} The agency employees asserted in their motion for summary judgment that it was undisputed that Tylor and Crystal "were not good parents." They acknowledged that Harmony had died of dehydration after she was left by her

mother in an overheated room without fluids. It was also undisputed that Crystal and Tylor had a long history of drug abuse and hoarding and had previously been accused of child endangerment following an incident in another county. The agency employees asserted that Tylor had abandoned Crystal and the children, "leaving them without any transportation or money," contributing to PCCS's involvement in November 2015.

{¶ 10} In his affidavit, Pease stated that in November 2015, he began investigating a report of possible abuse or neglect involving Crystal. Based on this report, Pease conducted an unannounced visit to Crystal's home on November 15 or 16, 2015.[1] Pease wrote in his case notes, which were submitted as evidence to support the motion for summary judgment, that Crystal may have had some hoarding issues and that Crystal admitted to that issue. He wrote that he heard "rocking/knocking noises from upstairs," that Crystal explained that Harmony banged her head to help her sleep, and that Crystal thought that Harmony may have had "some cognitive issues" but that nothing had been diagnosed. Pease's case notes did not indicate that he observed Harmony's room during this visit. Rather, he reported that he asked Crystal to bring Harmony down from her room so that he could see her. He documented that the three children still in Crystal's home, including Harmony, "appeared to be fine." Pease wrote that Crystal told him that she was taking Suboxone, a narcotic used for the treatment of opiate addiction, *see In re Z.F.,* 9th Dist. Summit Nos. 28246 and 28247, 2016-Ohio-7463, at ¶ 5-6, but that she was unwilling to take a drug screen. He also noted that Crystal did not have a working refrigerator and was apparently leaving food outside to keep it cold.

{¶ 11} According to his affidavit and case notes, Pease returned to Crystal's home on November 20, at which time he saw some improvement in the conditions. Pease did not document any observations of the children during that visit. While

---

1. In his affidavit, Pease claimed he conducted his visit on November 15. The case notes attached to Pease's affidavit indicate that this visit took place on November 16.

his notes indicate that he "walked through" the residence, they provide no specifics on the condition of Harmony's room. Pease's notes indicate that he told Crystal he would make referrals for her so that she could obtain help from local behavioral-health and counseling agencies.

{¶ 12} The day after this visit by Pease, Harmony collapsed while at Smathers's home. Emergency medical services transported Harmony to a nearby hospital. Hursey was the caseworker on call for PCCS that day. Hursey explained in her deposition that because it was a Saturday, she did not enter her case notes regarding her contacts that night until the following Monday. In her case notes, she wrote that when she spoke with law-enforcement officers, she was told that "the children' [sic] physical health does not appear good." Hursey spoke to the emergency-room doctor and noted that the doctor was concerned that Harmony might have internal injuries. The doctor told Hursey that Harmony had multiple bruises and a diaper rash and that she was weak and appeared emaciated.

{¶ 13} Hursey then noted that Harmony was flown to a pediatric-care unit in Huntington, West Virginia. Hursey also spoke to the doctor there. That doctor relayed that Harmony had been cleared by the trauma team, that her x-rays were negative, and that while her belly was distended, the doctor suspected that that was due to gas. Hursey documented that the doctor also told her that Harmony had bruises on her belly, older bruises on her spine, cradle cap, and "a narly [sic] diaper rash." Hursey noted that the doctor told her that Harmony would be monitored and that she might be discharged the following day. Her notes indicate that she left her phone number and asked that she be notified of any further concerns.

{¶ 14} In her deposition, Hursey stated that she may have called Pease that evening to inform him of what was going on and to ask whether he had had any concerns regarding Harmony after he had been to her home the day before. That call was not documented in the agency's case notes. Hursey recalled in her deposition that she received a phone call from someone, possibly a social worker,

at the hospital in regard to Harmony's discharge the following Monday, November 23, but this call was not entered in the case notes.

{¶ 15} According to his affidavit and case notes, on November 24, Pease, along with caseworker Taylor, attempted a home visit with Crystal but no one was at the residence. The next case note was entered for December 3, nine days later, and documented a phone call between Pease and Crystal. Pease wrote that Crystal told him that she was not home when he came by because Harmony was being released from the hospital.[2] Pease documented that Crystal told him Harmony had been fine before she went to Smathers's house and that Crystal feared that something may have happened to Harmony while in Smathers's care. Pease scheduled a home visit with Crystal for the following day to "check on the status of the home and to see the children." Pease then called Smathers, who told Pease that "she and Tylor were going to look into [getting] custody" of Harmony and were planning to go to the courthouse to look into filing the necessary paperwork.

{¶ 16} Pease documented in his case notes that the next day, he attempted to make the scheduled visit at Crystal's house but that he did not make contact with anyone. He and Taylor then met with Smathers and Tylor at PCCS, when Smathers and Tylor came to the agency; Harmony was with Smathers and Tylor. Pease's affidavit confirms that Smathers showed the caseworkers undated photographs depicting Harmony with bruises and places on her scalp that were missing hair as well as photographs of Crystal's home. Smathers averred in her affidavit that she specifically told Pease and Taylor at this meeting that hospital staff suspected abuse and neglect and that she did not want to give Harmony back to Crystal. Pease documented that when he asked Tylor for the discharge paperwork from the hospital, Tylor told him that Crystal might have it. Pease also noted that when he

---

2. The notes document that Crystal said that Harmony was released from the hospital on November 25, not November 24, the date of Pease's visit. Documents from the hospital indicate that Harmony was discharged on November 23 at 4:08 p.m.

"spoke about custody and divorce," Tylor told him that "he didn't want to divorce [Crystal] at this time."

{¶ 17} Pease's case notes show that he again tried to contact Crystal on December 4 and December 7.  On December 11, Pease was finally able to conduct a home visit.  Pease observed Harmony in Crystal's home that day and Crystal informed him that the children had been visiting with their father.  Pease wrote that he encouraged allowing the children to visit with their father so that Crystal could have "some down time to work on the home."  Pease asked Crystal whether she had any of the discharge papers from Harmony's hospital visit; Crystal said that Tylor had them.

{¶ 18} Pease's case notes state that on December 18, he and Taylor conducted another home visit with Crystal.  He again wrote that Crystal told him that the children had been visiting with their father, but Harmony and another child were with Crystal that day.  Crystal also signed a medical release that day so that Pease could obtain Harmony's hospital records.  Pease and Taylor observed Harmony's bedroom during this visit and noted no concerns.  Taylor testified that they wanted to look at the room because "there had been previous concerns" about the room.

{¶ 19} Pease did not fax the medical release to the hospital until December 22.[3]  He received the hospital records that same day and took them to PCCS's executive director, Glass.

{¶ 20} The records from the hospital indicate that although there were no traumatic injuries, Harmony was admitted to the pediatric-intensive-care unit ("PICU") for observation because there were suspicions of child abuse and neglect.  The discharge notes from the PICU state:

---

3. Pease claims in his affidavit that he faxed the medical release on December 21, 2015.

Today the patient was cleared by [PCCS] for discharge home despite an overwhelming amount of evidence concerning for [sic] physical abuse and neglect. From our observations we had serious concerns about the child's safety and are reluctant to send her back to this environment. Today she is stable for discharge. She will be discharged home with instructions given to the parents to follow up with her [primary-care physician] on Wednesday 11/25. We discussed our concerns for this patient and discussed patient safety and what constitutes neglect and what is considered to be abuse. The parents did not come to the hospital with a car seat or clothing. Discharge is pending them getting a car seat for transport home.

{¶ 21} In an affidavit attached to the agency employees' motion for summary judgment, Glass characterized the hospital records as "inconsistent" because, in his view, the records contained notations that trauma was not found and noted the family's explanations for Harmony's bruises and why she was missing hair. In an earlier deposition, however, Glass agreed that the failure to obtain the medical records for 30 days was "troublesome." He also testified in the deposition that after reviewing the medical records, he told Pease to meet with the family to try to open a voluntary case to provide case-management services.

{¶ 22} But it does not appear that Pease did anything for a week after meeting with Glass on December 22, 2015. Pease attempted to reach Crystal by phone on December 29, and he tried to reach Tylor that same day without success. On December 31, Pease and Taylor made an unannounced visit to Crystal's home, but no one answered the door. Pease called Crystal on January 6, 2016, but she did not answer. Pease attempted to reach Crystal by phone around 2:00 p.m. on January 8. According to Pease's case notes, at approximately 6:00 p.m. that day, the agency

received a call from the sheriff's office that Harmony had been found dead at Crystal's home.

### B. The parties' positions

{¶ 23} In support of their motion for summary judgment, the agency employees argued seemingly contradictory theories. First, they asserted that there was never any indication that Harmony was in imminent danger and that they therefore never had grounds to remove her through court intervention. This theory presumes that Harmony was safe in her mother's care. The agency employees also claimed that they had not acted recklessly, because they had never been informed that either Smathers or Tylor had returned Harmony to her mother, although the agency records demonstrate that Harmony was at Crystal's home on two occasions in December. This theory presumes that Harmony was not safe with Crystal but was nonetheless safe because she was not in Crystal's care. The agency employees also claimed that they offered services and support and tried to "help the family, not try to break them up."

{¶ 24} Smathers testified in her deposition that she believed that the agency employees were annoyed with her and her family's reports. She said that she was aware that Tylor had equal rights to Harmony but said that Crystal would not answer the door when Tylor went to her house and that Crystal had threatened Smathers's family on social media. Tylor tried to file paperwork to obtain an "ex parte order," but he was told that there was no such thing. They did not have money to hire a lawyer, and Smathers felt that if she or Tylor tried to get custody, they would not be successful because "Children Services wasn't behind [them] in any way."

{¶ 25} In its judgment entry granting the agency employees' motion for summary judgment, the trial court looked at whether any of those employees had acted with a malicious purpose, in bad faith, or in a wanton or reckless manner to determine whether Smathers could establish any of the exceptions under R.C.

10

2744.03 to the immunity granted to government employees. However, in doing so, the trial court made determinations about what the evidence established, acting as a fact-finder in several respects. First, after setting forth the standard for assessing reckless or wanton misconduct, the trial court listed the facts it was relying on to determine that the agency employees were not reckless, stating, "The facts are as follows * * *." The trial court found that Harmony was in the custody of Smathers and Tylor from the time she was discharged from the hospital until approximately Christmas. This determination, in particular, occurred after the trial court resolved ambiguities between Smathers's deposition testimony and her affidavit and found her deposition testimony to be more reliable. The trial court also found that neither Smathers nor Tylor reported additional concerns to PCCS during that time and that they failed to notify PCCS that Harmony was with her mother. The trial court concluded that there was no genuine issue of material fact regarding the agency employees' actions, holding that because they did not act recklessly or wantonly or violate their duty of care, they were immune from liability.

### C. Appeal to the Fifth District Court of Appeals

{¶ 26} On appeal to the Fifth District, Smathers raised a number of issues related to the trial court's evidentiary conclusions and its application of the immunity statute, R.C. 2744.03. The Fifth District acknowledged that an appellate court reviewing a decision granting summary judgment does so using a de novo standard, presenting the appellate court with a "unique opportunity [of] reviewing the evidence in the same manner as the trial court." 2020-Ohio-3264, ¶ 48. However, when the Fifth District began its review of the evidence, it mistakenly indicated that it would give deference to the trial court's findings of fact and not disturb those findings so long as they were supported by competent, credible evidence. The Fifth District held that "the trial court's factual findings that Harmony Carsey was in the custody of her father and Appellant Smathers from on

or about Thanksgiving until Christmas is supported by competent, credible evidence, and will not be disturbed by this Court." *Id*. at ¶ 62.

{¶ 27} The Fifth District then looked at whether summary judgment was appropriate and agreed with the trial court that there were no genuine issues of material fact as to whether the agency employees acted with willful indifference or recklessness. The court of appeals pointed to the agency employees' claims that they saw no evidence of abuse or neglect or immediate threat of serious harm. The Fifth District noted that the agency employees believed that Harmony was in the custody of Tylor or Smathers. The Fifth District concluded that the agency employees' conduct did not rise to a level of recklessness and that the trial court therefore was correct in granting summary judgment.

{¶ 28} We accepted Smathers's discretionary appeal. 160 Ohio St.3d 1485, 2020-Ohio-5454, 158 N.E.3d 613.

## II. Analysis

{¶ 29} Smathers raises four propositions of law. We agree with her third proposition of law—that the court of appeals employed the wrong standard when reviewing the trial court's decision to grant the agency employees' motion for summary judgment—and decline to address her remaining arguments.

### A. *Summary judgment*

{¶ 30} When reviewing the decision of a trial court granting or denying a party's motion for summary judgment, an appellate court applies a de novo standard of review. *A.J.R. v. Lute*, 163 Ohio St.3d 172, 2020-Ohio-5168, 168 N.E.3d 1157, ¶ 15. The appellate court conducts an independent review of the evidence without deference to the trial court's findings. *Wilmington Savs. Fund Soc., FSB v. Salahuddin*, 2020-Ohio-6934, 165 N.E.3d 761, ¶ 20 (10th Dist.). It examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, Civ.R. 56(C), and determines, as

if it were the trial court, whether summary judgment is appropriate. *Wilmington* at ¶ 19.

{¶ 31} To prevail under Civ.R. 56, the party moving for summary judgment must show the following:

> (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party.

*Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). The party opposing the motion must show that any issue of material fact is genuine and not based merely on unsupported allegations or the pleadings. *Lute* at ¶ 26.

{¶ 32} But determining whether issues of disputed fact exist is different from making findings of facts. While it is true that trial courts are generally in the best position to determine the weight of evidence and the credibility of witnesses when acting as a trier of fact, *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), on a summary-judgment motion, any inferences regarding the evidence, including the resolution of ambiguities or inconsistencies, must be made in a manner that favors the nonmoving party, Civ.R. 56(C). *See Wills v. Frank Hoover Supply*, 26 Ohio St.3d 186, 188, 497 N.E.2d 1118 (1986) ("In reviewing a motion for summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party"), citing Civ. R. 56(C). Because the movants sought to resolve this case on summary judgment, the evidence in this case could not be weighed, only reviewed by the trial court and by the court of appeals de novo. When factual ambiguities exist, inferences must still be resolved in favor of the nonmoving party.

### B. Immunity under R.C. 2744.03

**{¶ 33}** An employee of a political subdivision is not entitled to immunity from suit under R.C. 2744.03 if it can be shown that "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner," R.C. 2744.03(A)(6)(b). We have explained that the terms " 'willful,' 'wanton,' and 'reckless,' [as used in R.C. 2744.03(A)(6),] describe different and distinct degrees of care and are not interchangeable." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 31. We defined reckless conduct as "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34; *see also O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at ¶ 73 (referring to recklessness as a "perverse disregard of a known risk"). Wanton misconduct is "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at ¶ 33.

**{¶ 34}** In our review of the order granting summary judgment, we must determine not whether the agency employees acted in a reckless or wanton manner but whether reasonable minds could find that they acted in such a manner when the facts presented are viewed in a light most favorable to Smathers. If the undisputed evidence shows that the agency employees' actions were not reckless or wanton, then the agency employees are immune and summary judgment is proper.

### C. The "findings" below

**{¶ 35}** Smathers's first assignment of error below argued that the trial court disregarded conflicting evidence related to whether she and Tylor had custody of Harmony from Thanksgiving until Christmas. 2020-Ohio-3264 at ¶ 51. The Fifth District interpreted this as a challenge to the trial court's "findings of fact" and explained that it would defer to the trial court's determination so long as it was supported by competent, credible evidence. *Id.* at ¶ 52. However, the Fifth District

misunderstood the argument that Smathers raised; she was not simply arguing that the court was incorrect in making a factual determination. We agree with Smathers that the Fifth District applied the wrong standard when it analyzed her first assignment of error. The trial court could not, under Civ.R. 56(C), determine a fact. Its duty was to determine whether the fact was in dispute.

{¶ 36} Smathers argued in the court of appeals that the evidence was at least in dispute and therefore presented an issue of fact for trial as to whether she and Tylor had custody of Harmony from Thanksgiving to Christmas. We agree. The evidence presented by the agency employees to support their motion for summary judgment shows that they were aware that Harmony was in Crystal's care during that time. First, while the trial court stated that Harmony was discharged from the hospital "into the custody of her father and plaintiff grandmother," the discharge paperwork in the hospital records, which were attached to Glass's affidavit, shows that Harmony was discharged to her parents, Tylor and Crystal. Smathers also testified in her deposition and in her responses to the agency employees' request for interrogatories that Harmony was released by the hospital to her parents. Tylor confirmed in his deposition that Harmony was released to him and Crystal. The hospital records also state that Harmony lived with her mother.

{¶ 37} The parties agree that on December 4, ten days after Harmony was released from the hospital, Pease saw her at PCCS in the care of Tylor and Smathers. But it is undisputed that Pease saw Harmony at Crystal's home on December 11 and again on December 18 when Pease and Taylor conducted another home visit. These visits occurred *after* the meeting with Tylor and Smathers at PCCS. During those visits, Crystal told Pease that the children had been visiting with their father, and Pease said he encouraged this to give Crystal some "down time." A fact-finder could infer from this statement that Pease understood that the children were primarily in their mother's care. The evidence does not demonstrate that any of the agency employees was able to confirm Harmony's whereabouts after

she was seen in Crystal's home, and there is nothing in the record to suggest that the agency employees ever attempted to verify the existence of a court order giving Tylor or Smathers superior rights to Harmony over Crystal.

{¶ 38} The agency employees and the courts below seem to have blamed Tylor and Smathers for returning Harmony to Crystal. But Tylor's and Smathers's conduct was not at issue on a summary-judgment motion. The issue before the trial court was whether the agency employees had acted recklessly or wantonly: what Tylor or Smathers did or did not do was relevant only to how the agency employees responded. Given the family's history of instability, Tylor's past addiction and the problems attendant to those difficulties, and the lack of a court order, it is questionable whether the agency employees acted recklessly or wantonly in assuming that Tylor or Smathers could keep Harmony from Crystal or could properly ensure Harmony's safety.

{¶ 39} The medical records also demonstrate that the hospital was reluctant to release Harmony because of suspected abuse and her parents' apparent inability to provide for her safety. Hursey recalled speaking to someone from the hospital— the same day that the hospital records indicate that Harmony was discharged—but she did not document that call. By determining that "[u]ntil the December 22 receipt of the hospital records, [the agency employees] did not know that the hospital staff felt there had been negligence and/or abuse," the trial court credited Hursey's claim that "[n]o one at the hospital ever advised [her] that they believed they had evidence of neglect or abuse." But there is evidence in the record, specifically deposition transcripts from physicians at the hospital, that contradicts this claim.

{¶ 40} When presented with Hursey's impression of their conversation, one doctor said, "The child was transferred [to the PICU] for concerns of abuse. That's why she was admitted, and I was speaking with [PCCS] about said concerns per what is documented here, so I cannot imagine myself telling her that I was not

16

concerned." And when asked if she would have told Hursey about the suspected abuse and neglect, the doctor said, "[A]gain, from what is documented and how our protocol is, I believe I would have told [PCCS] exactly all of the reasons why she was admitted and her full exam." A second doctor explained that while she did not have personal knowledge of the call to PCCS, she knew that "[they] wouldn't have written that paragraph if [they] didn't feel like [they] had told – that Child Protective Services had been informed that [they] thought it was abuse and neglect." When viewed in conjunction with the hospital records that explicitly state that PCCS was authorizing the child's release to her parents despite the doctors' concerns and the "overwhelming" evidence of abuse and neglect, the above testimony supports an inference that Hursey had been told this information. When viewing this evidence in a light most favorable to Smathers, it cannot be said that the agency employees did not act recklessly or wantonly when they permitted Harmony to be discharged into the custody of her parents.

{¶ 41} Additionally, a fact-finder's conclusion that Hursey had been informed of the doctors' concerns prior to Harmony's discharge from the hospital would also support a finding that the lack of action taken after that point amounted to a conscious disregard of or indifference to a known risk. There was a significant delay in the caseworkers' requesting the medical records from Harmony's hospitalization. Glass admitted that the agency's failure to obtain the medical records for nearly 30 days was "troublesome," and it is arguable that Pease's failure to obtain the records right away demonstrated persistent opposition to a generally accepted course to follow to protect children.

{¶ 42} Moreover, there is evidence supporting a conclusion that the agency employees acted recklessly or wantonly even after Glass, Pease, and Hursey obtained the medical records on December 22 and had knowledge that Harmony had been at risk of substantial and serious physical harm and neglect. In his affidavit, Glass stated that the hospital notes indicated that the trauma team had

elected to "sign off" because "there were no apparent signs of trauma." He found this to be "inconsistent with the notation in the discharge note that there was 'overwhelming evidence' concerning physical abuse and neglect." There is no evidence that any agency employee followed up with the PICU physicians who had recorded these concerns to better understand the basis for their conclusions regarding abuse and neglect; rather, the evidence presented could support a finding that the workers recklessly or wantonly disregarded the doctors' documented concerns.

{¶ 43} And although Glass told Pease to offer ongoing case services to Crystal, the evidence suggests that Pease made no attempt to talk to Crystal for at least another seven days after receiving the records. Although the agency made one call to Tylor and multiple calls to Crystal, there is nothing in the record to demonstrate that after obtaining the medical records, any of the agency employees attempted to verify that Harmony was actually with Smathers or Tylor. And as noted above, Pease and Taylor saw Harmony at Crystal's home after Harmony's release from the hospital and should have been aware that Harmony was in Crystal's care at least some of the time.

{¶ 44} Finally, Pease and Taylor viewed Harmony's bedroom during the December 18 visit to Crystal's home and expressed no concern about the conditions of the room. Smathers said that she had reported concerns about the excessive heat in the room, the safety of the crib apparatus, and the manner in which Harmony was being kept in the room given that she could jump out of the crib. And Taylor acknowledged that they viewed the room because concerns had been raised about it. There is evidence that the same conditions were apparent at the time of Harmony's death on January 8. Based on the evidence before the court, a fact-finder could infer that those conditions were present during the December 18 visit and conclude that Pease and Taylor consciously disregarded or were indifferent to

a known risk after observing the conditions of Harmony's room three weeks before her death.

{¶ 45} When we resolve any doubts or inconsistencies in the evidence in favor of Smathers's position, we conclude that there are genuine issues of material fact as to whether the agency employees acted recklessly or wantonly in failing to protect Harmony from a risk of injury from abuse or neglect.

### III. Conclusion

{¶ 46} In determining that the Fifth District failed to review the grant of summary judgment de novo, and without deference to the trial court, we also resolve the ultimate issue whether there is a genuine issue as to any material fact that would serve to defeat the immunity normally allowed to government employees. Based on our review of the evidence available in this case, we find that there are genuine issues of material fact as to whether the conduct of one or more of the agency employees was reckless or wanton. We need not reach a conclusion as to Smathers's other propositions of law, because genuine issues of material fact still exist such that summary judgment should not have been granted to the agency employees. We reverse the judgment of the Fifth District Court of Appeals, and we remand this matter to the trial court for further proceedings in accordance with this decision.

Judgment reversed

and cause remanded to the trial court.

O'CONNOR, C.J., and DEWINE, DONNELLY, and STEWART, JJ., concur.

FISCHER, J., concurs in part and dissents in part, with an opinion joined by KENNEDY, J.

———————————

**FISCHER, J., concurring in part and dissenting in part.**

{¶ 47} I agree with the majority opinion's conclusion that the Fifth District erred in evaluating the trial court's grant of summary judgment when it gave

deference to the trial court's factual findings instead of conducting a de novo review. *See Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, 3 N.E.3d 1173, ¶ 9 (appellate courts review summary-judgment decisions de novo). Therefore, I concur in and join Part II(A) of the majority opinion.

**{¶ 48}** But I believe our analysis should stop there. Instead of reviewing the merits to determine whether material facts exist to defeat summary judgment, we should simply remand the cause to the appellate court to review the merits under the correct standard of review. *See In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, ¶ 33. Because the majority opinion declines to do so, I must respectfully dissent from Parts II(B) and (C) of the opinion and the majority opinion's order remanding the cause to the trial court.

KENNEDY, J., concurs in the foregoing opinion.

_____

Burnside Law, L.L.C., Jeremy M. Burnside, and Robert M. Johnson, for appellant.

Teetor Westfal, J. Stephen Teetor, and Matthew S. Teetor, for appellees.

Willis, Spangler, Starling, and Ashley Rutherford Starling, urging reversal for amicus curiae Ohio Association for Justice.

Rittgers & Rittgers and Konrad Kircher, urging reversal for amicus curiae Child USA.

Pamela J. Miller, urging reversal for amicus curiae American Professional Society on the Abuse of Children.

Mazanec, Raskin & Ryder Co., L.P.A., and Frank H. Scialdone, urging affirmance for amici curiae Buckeye Association of School Administrators, County Commissioners Association of Ohio, Ohio Association of School Business Officials, Ohio Job and Family Services Directors' Association, Ohio Municipal

League, Ohio School Boards Association, Ohio Township Association, and Public Children Services Association of Ohio.

_____