**[Cite as *Plough v. Nationwide Children's Hosp.*, 2024-Ohio-5620.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Amy Plough et al., | : | |
| Plaintiffs-Appellants, | : | No. 24AP-293 |
| | | (C.P.C. No. 22CV-7918) |
| v. | : | |
| | | (ACCELERATED CALENDAR) |
| Nationwide Children's Hospital et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on November 26, 2024

**On brief:** *Paulozzi Co. LPA*, and *Todd O. Rosenberg*, for appellants. **Argued:** *Todd O. Rosenberg*.

**On brief:** *Vorys, Sater, Seymour and Pease LLP*, *Timothy B. McGranor*, *Theodore P. Mattis*, and *Danielle S. Rice*, for appellees. **Argued:** *Danielle S. Rice*.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Plaintiffs-appellants, Amy Plough and Joel Plough (collectively "the Ploughs" or "appellants"), appeal from the April 25, 2024 judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Nationwide Children's Hospital ("Nationwide" or "the hospital"), on Ms. Plough's negligence claim and Mr. Plough's derivative loss of consortium claim. Because we conclude the trial court erred in finding no genuine issues of material fact existed as to whether the hazard was created by a Nationwide employee Ms. Plough observed mopping nearby, we reverse and remand the matter to the trial court for further proceedings consistent with this decision.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2}    This matter arises from Amy Plough's November 14, 2020 slip and fall in the service hallway of Nationwide Children's Hospital during her pediatric clinical rotation at the hospital as a nursing student.  Ms. Plough sustained injuries from the fall and further alleged loss of consortium with her husband, Joel Plough, as a result of those injuries.

### A.  Ms. Plough's November 14, 2020 Slip and Fall

{¶ 3}    On November 14, 2020, Ms. Plough was working exclusively in the hospital's trauma and burn unit.  (Mar. 3, 2023 Amy Plough Dep. at 65, 69-70.)  Every morning during this rotation, including November 14, 2020, Mr. Plough dropped Ms. Plough off at the hospital's side employee entrance for her clinical shift.  (*See* Amy Plough Dep. at 69-75, 84.)  That door opened to a lobby where Ms. Plough and other nursing students would meet their clinical supervisor, Arah Cheng, and take the elevator up to the trauma and burn unit floor together for their shift.  (*See* Amy Plough Dep. at 69-75, 77, 84.  *See also* Apr. 14, 2023 Kristin Cress Dep. at 37-38.)

{¶ 4}    On November 14, 2020, at approximately 12:00 p.m., Ms. Plough and a fellow nursing student, Kristin (Talbert) Cress, decided to have lunch in the hospital's ground level cafeteria.  (Amy Plough Dep. at 84-85.  *See also* Aug. 8, 2023 John King Dep. at 11-12.  *Compare* Cress Dep. at 46-47 (expressing uncertainty about the location of the cafeteria the two women walked to that day).)  Prior to that date, Ms. Plough had not been to or sought out the cafeteria.  (Amy Plough Dep. at 76.)  Because they did not know how to get there using the hospital's service hallways—which are only accessible to employees of the hospital and cannot be accessed by the public (s*ee* King Dep. at 9-12, 16-17)—Ms. Cheng gave them directions.  (*See* Amy Plough Dep. at 76, 85-86, 101-02; Cress Dep. at 41-43.)  But they got lost on the way there.  (Amy Plough Dep. at 85-86; Cress Dep. at 27, 43.)  Ms. Plough and Ms. Cress recalled encountering "a lot of twists and turns in that hallway before we reached the long hallway where the cafe was" located on the ground level.  (Amy Plough Dep. at 86-87.  *See also* Cress Dep. at 42-43, 102-03.)  Eventually, the two women encountered a Nationwide employee in the service hallway and asked them for directions.

{¶ 5}    According to Ms. Plough, that person was "a housekeeper who was mopping away from the direction that we were headed which way the cafe was." (Sic.) (Amy Plough Dep. at 85-91.)  She described the custodian as a "five[-]foot tall, middle aged Hispanic

lady" and recalled seeing her with a rolling mop bucket cart while actively using the mop.[1] (*See* Amy Plough Dep. at 90, 96-97.) Ms. Plough stated the custodian "pointed the direction we were going, and said if you just keep walking, it will be there on your left." (Amy Plough Dep. at 85.) The two women continued past the custodian, walking down the hallway in the opposite direction from which they had come and toward the area where the housekeeper had come. (*See* Amy Plough Dep. at 85-86, 90.)

{¶ 6} After getting directions from the Nationwide employee, Ms. Plough described seeing "the entrance to the cafe and a food [tray] cart right out front of the entrance" just before she "slipped on a very clear, very slick substance" and fell approximately ten feet from the cafeteria entrance. (Amy Plough Dep. at 85-87. *See also id.* at 104, 107, 129, 133-38. *Compare* Cress Dep. at 53 (denying seeing a food tray cart in the hallway near where Ms. Plough fell).) Specifically, Ms. Plough stated her "left foot kind of slid in front of [her]," causing her to "land[] on [her] bottom." (Amy Plough Dep. at 107-09.) She described "instantly" feeling "pain, sharp shooting pain down [her] back and [her] leg," which resulted in injuries. (Amy Plough Dep. at 107, 109-10. *See also id.* at 145-49, 152-64; Mar. 3, 2023 Joel Plough Dep. at 22-33.) Both Ms. Plough and Ms. Cress denied seeing any spills or substances on the service hallway's "off-white" flooring prior to Ms. Plough's fall. (*See* Amy Plough Dep. at 87, 96, 99, 103, 126-40; Cress Dep. at 50-52, 87-88.) And there were no warning signs where Ms. Plough fell. (Amy Plough Dep. at 133.)

{¶ 7} Ms. Cress's recollection of events one and one-half years later differed in several respects from Ms. Plough's account. For instance, Ms. Cress recalled asking a white male employee wearing a gray uniform[2] for directions to the cafeteria sometime ***after*** Ms. Plough fell. (*See* Cress Dep. at 44-46, 56-57, 80, 86-87, 94.) And Ms. Cress did not believe he was carrying or pushing anything. (Cress Dep. at 45-47.) At the same time, Ms. Cress admitted to seeing multiple custodians cleaning in the service hallways of Nationwide on November 14, 2020, but could not recall how many people she saw or what type of equipment they had with them. (*See* Cress Dep. at 47-48, 99-101.) Ms. Cress could not recall, either way, whether she and Ms. Plough saw a custodian pushing a mop bucket or actively mopping when the two women were in the service hallway on November 14, 2020.

---

[1] There is no indication in the record before us that this person was ever identified or deposed in this case.

[2] There is no indication in the record before us that this person was ever identified or deposed in this case.

(*See* Cress Dep. at 47-48.) She also recalled seeing at least two custodians with mop buckets on carts that day. (Cress Dep. at 100-01.)

{¶ 8} Although Ms. Cress was with Ms. Plough when she fell, Ms. Cress claimed in her 2023 deposition that she did not actually see Ms. Plough fall. (*See* Cress Dep. at 54-56, 88-89.) But in a previous statement given by Ms. Cress shortly after the incident, Ms. Cress described her first-hand observation of the fall—"her feet went up in the air, and she fell to the floor, and she landed on her knees"—thus undermining Ms. Plough's 2023 recollection otherwise. (*See* Cress Dep. at 95.) Ms. Cress conceded her memory of events would have been better at the time she gave the statement in November 2020 than when she was deposed one and one-half years later. (*See* Cress Dep. at 86, 95.)

{¶ 9} After the fall, Ms. Plough got onto her hands and knees to get up, and Ms. Cress assisted her. (*See* Amy Plough Dep. at 83, 107-10; Cress Dep. at 54-56, 95.) The two women proceeded into the cafeteria for lunch. (*See* Amy Plough Dep. at 110-12; Cress Dep. at 57.) In the cafeteria, Ms. Plough told the cashier about the substance she slipped on in the hallway outside of the cafeteria, as well as a small puddle of water she observed, after her fall, in front of a cooler in the cafeteria. (*See* Amy Plough Dep. at 80-84, 103, 111-12.) After their "45 minutes of lunch" (Cress Dep. at 54), Ms. Cress recalled encountering the same "gentleman that gave us directions" in the service hallway when the two women left the cafeteria and telling him about the substance on the floor. (*See* Cress Dep. at 63-66, 94.) He said he would find someone to take care of it, but Ms. Cress did not know if the man inspected the slick substance himself. (Cress Dep. at 94-95.)

{¶ 10} When the two women returned to the burn and trauma unit after lunch, Ms. Plough told Ms. Cheng about the incident, at Ms. Cress's urging, and completed an incident report.[3] (*See* Amy Plough Dep. at 123, 143-45; Cress Dep. at 24-25, 63-64, 71-72, 104.) Although a member of Nationwide's security team, Sergeant John King, recalled reviewing an internal report created by other security personnel and investigating this incident, he admitted he did not speak to any witnesses or prepare any formal reports in conjunction

---

[3] That report was attached as "Exhibit A" to appellants' March 26, 2023 pre-trial statement. Although this report was filed before the trial court rendered its decision on Nationwide's summary judgment motion, we note the parties did not rely on the report in their briefing on summary judgment and did not provide a copy of this report to the trial court at the time their briefing on summary judgment was filed. Thus, we do not consider it for purposes of our analysis in this case.

with his investigation. (*See* King Dep. at 13-16, 19. *See also* Cress Dep. at 104-06; Amy Plough Dep. at 149-51.) Sergeant King indicated he was unable to determine, through his investigation, the source of the substance Ms. Plough slipped on in the service hallway. (King Dep. at 18. *See also* Cress Dep. at 103-04.) Indeed, Ms. Cress took Ms. Cheng to the location of Ms. Plough's fall a few hours after the incident, but the substance was no longer on the floor at that time. (*See* Cress Dep. at 75-76, 104-06.)

{¶ 11} While on the ground of the service hallway, Ms. Plough observed what she described as a film-like "clear fluid, very oily with these kind of like off-white dirty looking flakes that stuck to [her] scrubs" on the hallway floor. (*See* Amy Plough Dep. at 113-15, 120, 130-34, 139-40.) In that moment, Ms. Plough "couldn't figure out what it was [she] slid on," but observed her scrubs were "very wet" and "soaked with something very oily and slick and with flecks of something." (*See* Amy Plough Dep. at 107, 109, 114-15, 117. *See also* Cress Dep. at 90, 102 (describing Ms. Plough's left knee as wet after her fall).) Ms. Plough described the flecks she observed in the substance as off-white and gray in color; smaller than a pencil-tip eraser but larger than a speck; and lacking sufficient volume to pick up. (*See* Amy Plough Dep. at 118-20, 166-67. *Compare* Cress Dep. at 59, 61-62 (denying observing any "sparkles or flakes" in the substance on the ground and describing the substance that transferred onto Ms. Plough's pants as brown).)

{¶ 12} Ms. Plough estimated the slick substance on the service hallway floor was approximately ten feet long and two feet wide because, after falling to the ground, she slid a considerable distance across the floor towards the cafeteria. (*See* Amy Plough Dep. at 114-15, 126-27. *Compare* Cress Dep. at 92-93 (describing the slick substance as 20 feet from the cafeteria door).) On the other hand, Ms. Cress recalled observing a "tiny little patch" of the substance, which she described as "baseball-sized," on the floor where Ms. Plough fell, as well as a couple other small spots of the same substance nearby, indicative of something dripping over a span of approximately three feet. (*See* Cress Dep. at 58-60, 90-92, 96.) Ms. Cress was unsure as to whether Ms. Plough smeared the substance on the floor when she slid across the floor and admitted that, because she did not see anything on the floor before Ms. Plough fell down, she did not know the surface area of the slick substance—some of which had been absorbed into Ms. Plough's scrubs—preceding the fall. (*See* Cress Dep. at 68, 90-91.)

{¶ 13} Mr. Plough picked Ms. Plough up from Nationwide before her clinical shift ended on November 14, 2020 because she was in pain. (*See* Amy Plough Dep. at 143-44.) He recalled observing something "white and dandruffy [sic], flaky" on Ms. Plough's scrubs and wondering "if it was dried soap." (Joel Plough Dep. at 22-23. *See also id.* at 58-59.) Mr. Plough also recounted detecting an odor of soap or chemical cleaner on Ms. Plough's scrubs before washing them later that day. (*See* Joel Plough Dep. at 59-60. *See also* Amy Plough Dep. at 124.) Though, neither Ms. Plough nor Ms. Cress could recall any particular odor associated with the substance they encountered on the service hallway floor on November 14, 2020. (Amy Plough Dep. at 114; Cress Dep. at 59.)

{¶ 14} The record established it was snowing on November 14, 2020 and there was salt on the outdoor sidewalks. (*See* Amy Plough Tr. at 121; Cress Dep. at 54.) Ms. Cress opined the substance "looked like when like the snow and stuff mixes with the salt, kind of that brown slushy stuff." (Cress Dep. at 54, 58-59. *See also id.* at 91-92.) But Ms. Cress admitted she did not touch the substance on the floor or otherwise make any attempt to figure out what it was. (Cress Dep. at 54, 58-59, 91.)

{¶ 15} Ms. Plough and Ms. Cress both maintained the slick substance that caused Ms. Plough to fall was ***not*** frozen, partially or otherwise. (*See* Amy Plough Dep. at 117-23; Cress Dep. at 57-59, 101-02.) Both women also explicitly stated the substance on the floor was not a puddle. (*See* Cress Dep. at 58-59; Amy Plough Dep. at 113-15. *See also* Cress Dep. at 57-59, 92 (describing the substance as "thick" in some spots and "pretty thin" in others).) When asked by Nationwide's counsel whether the substance was "icy or slushy," Ms. Plough responded: "It was cold. Based on the flakes on my uniform, I would characterize it as maybe a little slushy." (Amy Plough Dep. at 117-18. *See also* Nov. 11, 2022 Compl. at ¶ 12.) She later clarified, "[i]f I were to characterize it [was] slushy, it would be because of the flakes in it that kind of gave it a ***texture*** like a slushiness." (Emphasis added.) (Amy Plough Dep. at 117-20.) Ms. Plough also explained the "flakes" she described seeing in the slick substance on the floor and her scrubs were not salt particles because they were flat. (*See* Amy Plough Dep. at 166-67. *See also* Joel Plough Dep. at 59.) Ms. Cress likewise did not recall seeing salt in the substance on the floor. (Cress Dep. at 101.)

{¶ 16} Although Ms. Plough acknowledged during questioning by Nationwide's counsel that it was possible the substance she slipped on in the hallway "could have been

sort of salt-filled * * * water or slush from outside" (Amy Plough Dep. at 122), Sergeant King indicated the area where Ms. Plough fell was located a "considerable distance" from the nearest exit to the outside. (King Dep. at 11-12.) Sergeant King further explained that there are no exterior doors—other than one leading to an underground garage that "still would have been hundreds of feet away"—located on the lower level of the hospital where the cafeteria is located. (*See* King Dep. at 11-12. *Compare* Cress Dep. at 93 (admitting she did not know whether any exterior doors were nearby).) And Ms. Cress acknowledged there was no indication the substance had been tracked into the hallway from outside. (*See* Cress Dep. at 92.)

{¶ 17} Based on her observation of the custodian actively mopping in the hallway while coming from the direction of the spill and the appearance of the slick substance on which she slipped, Ms. Plough believed the substance she slipped on was mop water (or residue) left behind by the custodian mopping that hallway. (*See* Amy Plough Dep. at 112-13, 115-16.) Ms. Plough first conveyed her suspicion that mop water may have been the substance she slipped on in her November 19, 2020 text message to Ms. Cress. (*See* Cress Dep. at 97-99.) Ms. Plough conceded, however, that she did not see anyone put the substance she slipped on in the location where she fell and did not know how long it had been there. (Amy Plough Dep. at 123-24.) And, because Ms. Plough's husband washed her scrubs later that day, they could not be tested to confirm the source of the substance. (*See* Amy Plough Dep. at 124-25; Joel Plough Dep. at 61-62.)

{¶ 18} In terms of the mopping custodian's relative proximity to the spill in the hallway, Ms. Plough indicated the custodian "had come from the hallway leading away from the cafe" and was actively mopping "right around the corner" from where she fell when the two women first encountered her in the hall.[4] (Amy Plough Dep. at 87-92, 95.) Ms. Plough estimated there were "a hundred feet" between the turn where she had seen the custodian mopping and the cafeteria entrance. (*See* Amy Plough Dep. at 92-95.) At the same time, Ms. Plough acknowledged she did not know how long the custodian had been in the hallway outside of the cafeteria or exactly where the custodian had been before she and Ms. Cress

---

[4] Unfortunately, the record does not contain any diagrams, drawings, or photographs depicting the hallway where the fall occurred in relation to the location of the cafeteria entrance, the spill causing Ms. Plough's slip and fall, or the custodian when Ms. Plough and Ms. Cress first encountered her. (*See* Amy Plough Dep. at 151-52.)

first encountered her actively mopping in the hall.  (*See* Amy Plough Dep. at 91, 95-97.) Significantly, the undisputed record established that any custodian mopping in Nationwide's hallways would be an employee of the hospital.  (*See* King Dep. at 18-21.)

{¶ 19}  Neither Ms. Plough nor Ms. Cress knew of anyone else who observed the slick substance on the service hallway floor before or after Ms. Plough fell.  (*See* Amy Plough Dep. at 100-02; Cress Dep. at 51, 94.)  As explained by Sergeant King, the relevant areas of the service hallway were not captured on video surveillance because the camera coverage of that hallway was considerably limited. (*See* King Dep. at 7-12.)  More precisely, Sergeant King stated the available surveillance footage of that hallway did not show Ms. Plough's fall or a custodian mopping the floor.  However, given the described location of events were not within the frame of the service hallway's surveillance cameras, this was not surprising. (*See* King Dep. at 7-12.)  Notably, too, because Sergeant King did not find anything remarkable on the hallway surveillance video when he reviewed it around the time of the incident, he explained the footage would have only been preserved by Nationwide for two weeks thereafter.  (King Dep. at 22-23.)

**B.  Negligence Action Against Nationwide Children's Hospital**

{¶ 20}  In November 2022, the Ploughs initiated this action against Nationwide, alleging claims for "negligence and/or recklessness" (hereinafter "the negligence claim") and loss of consortium.  (Compl. at ¶ 12.)  As to the negligence claim, the Ploughs alleged "the negligence and/or recklessness of [Nationwide Children's Hospital] and/or its' employees" caused Ms. Plough to slip and fall in the hospital's hallway "due to a slushy substance on the floor due to the negligence of a Nationwide Children's Hospital employee." (*Id.*)  She also generally alleged that "[t]he slushy substance on the floor constituted a dangerous condition which was either created by [Nationwide], should have been known by [Nationwide], and [Nationwide] should have corrected the condition or warned of its existence." (Compl. at ¶ 8.)

{¶ 21}  Nationwide moved for summary judgment in July 2023 on the basis that "(1) [Ms. Plough] can offer no evidence that [Nationwide] had actual or constructive notice of the hazard; and (2) the 'slushy substance' was open and obvious as a matter of law." (July 10, 2023 Mot. for Summ. Jgmt. at 2.)

{¶ 22} In opposing that motion, appellants argued there was a genuine issue of material fact as to whether the alleged mopping by a Nationwide employee created the hazard resulting in Ms. Plough's injuries. (*See* Aug. 7, 2023 Memo Contra at 2-11.) Appellants also contended that whether the hazard was open and obvious remained a genuine issue of material fact. (Memo Contra at 11-16.) In support, appellants relied on their March 2023 deposition testimony, the April 2023 deposition testimony of Ms. Cress, and the report of their architectural and human factors expert, Richard L. Zimmerman.

{¶ 23} Notably, Sergeant King's deposition was taken the day *after* the Ploughs filed their memorandum opposing Nationwide's summary judgment motion. Thus, appellants filed the transcript of Sergeant King's deposition on August 25, 2023 and were subsequently granted leave to incorporate into their arguments opposing summary judgment, over the objection of Nationwide, his testimony admitting that any custodian observed mopping in Nationwide's service hallway would have been a Nationwide employee. (*See* Aug. 25, 2023 Mot. for Leave to File Reply; Aug. 28, 2023 Memo Contra to Mot. for Leave to File Reply; Sept. 21, 2023 Entry Granting Mot. for Leave.)

{¶ 24} On April 25, 2024, the trial court issued a written decision granting Nationwide's motion for summary judgment. Specifically, the trial court found that because Ms. Plough did not know what she slipped on, how the substance got on the service hallway floor, or how long it had been there, appellants could not establish actionable negligence against Nationwide. (Apr. 25, 2024 Jgmt. Entry at 4.) The trial court did not rule on the issue of whether the substance was open and obvious.

{¶ 25} Appellants timely appealed from that judgment and raise the following four assignments of error for our review:

> [I.] THE TRIAL COURT ERRED BY HOLDING THAT PLAINTIFF-APPELLANT AMY PLOUGH FAILED TO SUFFICIENTLY IDENTIFY THE WATER CAUSING HER FALL AS MOP WATER.
>
> [II.] THE TRIAL COURT ERRED BY HOLDING THAT PLAINTIFFS-APPELLANTS FAILED TO PRESENT EVIDENCE THAT THE MOP WATER WAS CAUSED BY [NATIONWIDE'S] EMPLOYEE MOPPING THE FLOOR.
>
> [III.] THE TRIAL COURT ERRED IF IT HELD THAT THE WATER WAS OPEN AND OBVIOUS.

[IV.] THE TRIAL COURT ERRED SINCE IT APPLIED THE WRONG LEGAL STANDARD WHEN IT STATED THAT PLAINTIFFS-APPELLANTS FAILED TO PRESENT "CONVINCING, UNDISPUTED EVIDENCE" OF NEGLIGENCE.

## II. ANALYSIS

{¶ 26} Appellants contend they produced evidence from which an inference can reasonably be drawn that Nationwide's custodial employee created the hazard resulting in Ms. Plough's slip and fall injuries. On review of the record, we agree. Thus, for the following reasons, we find the trial court erred in finding no genuine issue of material fact remained on the issue of duty and granting summary judgment against appellants on the grounds stated in the trial court's decision.

### A. Summary Judgment Standard and Standard of Review

{¶ 27} Under Civ.R. 56(C), summary judgment is proper when the moving party establishes: (1) an absence of genuine issues of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) construing the evidence most strongly in favor of the nonmoving party, reasonable minds could only find in favor of the moving party. *See, e.g., State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, ¶ 9; *Oliver v. Fox's Food, L.L.C.*, 10th Dist. No. 22AP-73, 2023-Ohio-1551, ¶ 9.

{¶ 28} Civ.R. 56(C) limits the types of materials a court may consider in ruling on a motion for summary judgment. Specifically, it provides that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Supporting and opposing affidavits submitted under Civ.R. 56(C) "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Civ.R. 56(E). Additionally, " '[o]nly facts which would be admissible in evidence can be * * * relied upon by the trial court when ruling upon a motion for summary judgment.' " *Guernsey Bank v. Milano Sports Ents., L.L.C.*, 177 Ohio App.3d 314, 2008-Ohio-2420, ¶ 59 (10th Dist.), quoting *Tokles & Son, Inc. v. Midwestern Indem. Co.*, 65 Ohio St.3d 621, 631 (1992), fn. 4.

{¶ 29} The party moving for summary judgment bears the initial burden of informing the trial court of the basis of the motion and identifying the portions of the record that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the nonmoving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the nonmoving party has no evidence to support the nonmoving party's claims. *Oliver* at ¶ 9, citing *Dresher* at 293, and *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997).

{¶ 30} If the moving party has satisfied its initial burden under Civ.R. 56(C), then the nonmoving party " 'has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.' " *Heimberger v. Zeal Hotel Group Ltd.*, 10th Dist. No. 15AP-99, 2015-Ohio-3845, ¶ 14, quoting *Dresher* at 293. The nonmoving party may not rest on the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material that shows the existence of a genuine dispute over the material facts. *A.M. v. Miami Univ.*, 10th Dist. No. 17AP-156, 2017-Ohio-8586, ¶ 30, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991). In the summary judgment context, a "material" fact is one that might affect the outcome of the case under the applicable substantive law. *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). A genuine dispute exists if the evidence presents a sufficient disagreement between the parties' positions. *Id.*

{¶ 31} We review decisions granting summary judgment de novo. *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-870, 2015-Ohio-2661, ¶ 12, citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5. Under the de novo standard of review, we apply the same legal standard as the trial court but conduct an independent review of the evidence without deference to the trial court's decision. *See, e.g.*, *Gabriel* at ¶ 12; *Nazareth Deli LLC v. John W. Dawson Ins. Inc.*, 10th Dist. No. 21AP-394, 2022-Ohio-3994, ¶ 22. "We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it." *Riverside v. State*, 190 Ohio App.3d 765, 2010-

Ohio-5868, ¶ 17 (10th Dist.), citing *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 32} It is well-established, however, that "on a summary-judgment motion, any inferences regarding the evidence, including the resolution of ambiguities or inconsistencies, must be made in a manner that favors the nonmoving party." *Smathers v. Glass*, 172 Ohio St.3d 84, 2022-Ohio-4595, ¶ 32, citing Civ.R. 56(C) and *Wills v. Frank Hoover Supply*, 26 Ohio St.3d 186, 188 (1986) ("In reviewing a motion for summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party."). Because Nationwide "sought to resolve this case on summary judgment, the evidence in this case could not be weighed." *Id.* Indeed, "we are required not only to construe evidence in a light most favorable to nonmoving parties but to also resolve inferences which may reasonably be drawn from the evidence in favor of nonmoving parties." *Thompson v. Ohio State Univ. Physicians, Inc.*, 10th Dist. No. 10AP-612, 2011-Ohio-2270, ¶ 16, citing *McCarthy v. Robinson*, 10th Dist. No. 94APE05-619, 1994 Ohio App. LEXIS 5348 (Dec. 1, 1994). Thus, " '[w]here competing inferences may be drawn or where the facts presented are uncertain or indefinite, summary judgment is not appropriate and such matters must be left to the trier-of-fact.' " *Id.*, quoting *Sprouse v. Allstate Ins. Co.*, 10th Dist. No. 89AP-131, 1989 Ohio App. LEXIS 3990, *4-5 (Oct. 17, 1989), citing *Duke v. Sanymetal Prods. Co.*, 31 Ohio App.2d 78 (8th Dist.1972). *See also Smathers* at ¶ 32 ("When factual ambiguities exist, inferences must still be resolved in favor of the nonmoving party.").

## B. Legal Standards

{¶ 33} Ms. Plough asserted a negligence claim against Nationwide based on her theory that her slip and fall in the hospital's service hallway on November 14, 2020 was proximately caused by the negligent actions of a Nationwide employee mopping nearby.

{¶ 34} To establish negligence, a plaintiff must prove: (1) the existence of a duty; (2) a breach of that duty; and (3) an injury proximately resulting from the breach. *See, e.g.*, *A.M.*, 2017-Ohio-8586 at ¶ 32; *Kiser v. United Dairy Farmers*, 10th Dist. No. 22AP-539, 2023-Ohio-2136, ¶ 10.

**{¶ 35}** Moreover, to recover for injuries that occurred as a result of a slip and fall on property owned by a defendant, an invitee (there is no dispute that, as a nursing student working a clinical shift at Nationwide, Ms. Plough was an invitee) must establish:

> (1) that the landowner or occupier through its officers or employees was responsible for creating the hazard; or
>
> (2) that at least one employee or officer had actual knowledge of the hazard but failed to eliminate it or give adequate notice of its existence; or
>
> (3) that such danger existed for a sufficient length of time that it is reasonable to infer that failure to warn against it or remove it was due to want of ordinary care.

*Nienhaus v. Kroger Co.*, 10th Dist. No. 00AP-1083, 2001 Ohio App. LEXIS 2638, *9-10 (June 14, 2001), citing *Johnson v. Wagner Provision Co.*, 141 Ohio St. 584, 589 (1943). *See also Beair v. KFC Natl. Mgt. Co.*, 10th Dist. No. 03AP-487, 2004-Ohio-1410, ¶ 9, citing *Gon v. Dick Clark's Am. Bandstand & Grill*, 10th Dist. No. 96APE07-910, 1997 Ohio App. LEXIS 534 (Feb. 11, 1996).

### C. Application

**{¶ 36}** In opposing Nationwide's summary judgment motion, appellants clearly argued in the trial court that the evidence created a genuine issue of material fact as to whether Nationwide's employee ***created*** the hazard that caused Ms. Plough's fall. This argument thus implicated the ***first*** prong: whether Nationwide, though its employee, was responsible for creating the hazard that caused Ms. Plough's injuries. Accordingly, appellants were not required to prove Nationwide had actual or constructive knowledge "since proof of creation of the hazard is equivalent to proof of knowledge." *Nienhaus* at *11, citing *Tandy v. St. Anthony Hosp.*, 10th Dist. No. 88AP-551, 1988 Ohio App. LEXIS 4765, *5 (Nov. 29, 1988).

**{¶ 37}** The trial court found appellants could not prove Nationwide had actual or constructive notice of its presence. (Apr. 25, 2024 Jgmt. Entry at 4.) But because this theory of liability had no application to analyzing appellants' stated negligence claim, the trial court's findings of fact and conclusions of law regarding actual/constructive notice are wholly irrelevant to our analysis of the ultimate issue presented here: whether there was a

genuine of material fact that Nationwide's custodial employee created the hazard that resulted in Ms. Plough's injuries.

{¶ 38} In addressing this issue, the trial court found appellants could not "***prove*** that [Nationwide's employee] placed the substance on the floor." (Emphasis added.) (Apr. 25, 2024 Jgmt. Entry at 4.) Initially, we find it was error for the trial court to make any factual or credibility determinations about what the evidence established. *See Meredith v. ARC Industries*, 10th Dist. No. 24AP-117, 2024-Ohio-4466, ¶ 35, citing *Smathers*, 2022-Ohio-4595 at ¶ 32 (explaining that, in the summary judgment context, "[d]etermining whether issues of disputed fact exist is different from making findings of facts"). To defeat Nationwide's summary judgment motion, appellants did not need to "***prove***," as the trial court stated, that Nationwide's employee created the hazard by placing the substance on the floor. (Emphasis added.) (*See* Apr. 25, 2024 Jgmt. Entry at 4.) Rather, appellants had to show that, based on "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action," a genuine issue of material fact on that issue remained. *See* Civ.R. 56(C). At the summary judgment stage, the nonmoving party is not required to prove anything with certainty, but, instead, is required only to meet the evidence furnished by the moving party so as to show there remains a genuine issue of material fact. To be clear, the burden is on the moving party to demonstrate that there remain no genuine issues of material fact for trial and entitlement to judgment as a matter of law. *See* Civ.R. 56; *Dresher*, 75 Ohio St.3d at 292-93.

{¶ 39} Setting aside the trial court's erroneous statement of appellants' burden of proof to overcome a summary judgment motion, the trial court found—and Nationwide now argues on appeal—that Ms. Plough's uncorroborated, "self-serving" testimony about seeing the Nationwide employee mopping in the service hallway shortly before she fell could not, as a matter of law, create an issue of fact to defeat summary judgment. (Apr. 25, 2024 Jgmt. Entry at 4.) In support of that finding, the trial court relied on *White v. Sears*, 10th Dist. No. 10AP-294, 2011-Ohio-204, which held "a non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence." *Id.* at ¶ 9. (*See* Apr. 25, 2024 Jgmt. Entry at 4.)

{¶ 40} But, we recently ***overruled*** prior decisions from this court, including *White*, to the extent they held that "a nonmoving party may never demonstrate the existence of a genuine issue of material fact with 'self[-]serving' testimonial evidence alone." *Kiser*, 2023-Ohio-2136 at ¶ 24. In so doing, we explained:

> *White* has been used in decisions of this court to say a nonmovant's own uncorroborated, self-serving assertions, whether made in an affidavit, deposition, or interrogatory responses, cannot defeat a well-supported summary judgment motion. *See, e.g.,* [*Pankey v. Ohio State Hwy. Patrol*, 10th Dist. No. 20AP-234, 2021-Ohio-1317, ¶ 9 ("Additionally, a nonmovant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence")]; [*Kean v. Cincinnati Ins. Co.*, 10th Dist. No. 20AP-177, 2021-Ohio-490, ¶ 11 ("Additionally, a nonmovant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence")]. This principle imposes several requirements beyond those contained in Civ.R. 56. Civ.R. 56(C) and (E) do not impose heightened standards for evidence produced by the nonmoving party. The rule does not require either party to corroborate competent testimonial evidence made on personal knowledge. It does not prohibit either party from submitting "self-serving" evidence that conforms with the rule. And, as we see in the proceedings below, this princip[le] has led to trial courts excluding otherwise valid evidence that would create a genuine dispute of material fact at summary judgment. For example, we recently reversed the court of claims on summary judgment after it relied on this mistaken interpretation of *White* to discount a nonmoving party's statements as "self-serving" and thus "not worthy of belief." *Hill v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-88, 2021-Ohio-561, ¶ 27.

*Kiser* at ¶ 23. Because of its mistaken reliance on *White*—notwithstanding this court's June 2023 decision in *Kiser* overruling that holding—the trial court failed to consider whether a finder of fact could reasonably infer, based on Ms. Plough's deposition testimony and other evidence presented by the parties, that a Nationwide employee created the hazard that caused Ms. Plough's injuries from the November 14, 2020 slip and fall.

{¶ 41} It is generally true, as the trial court noted, that a nonmovant cannot meet her reciprocal burden of demonstrating a genuine issue of material fact remains for trial by relying upon mere speculation or conjecture. (Apr. 25, 2024 Jgmt. Entry at 4, citing *Sharp*

*v. Andersons, Inc.*, 10th Dist. No. 06AP-81, 2006-Ohio-4075.)   But, for the reasons explained below, we find the evidence in this case is neither speculation nor conjecture.

{¶ 42} In her March 2023 deposition, Ms. Plough described seeing a custodian mopping the service hallway coming from the direction where she slipped just before her fall. (*See, e.g.*, Amy Plough Dep. at 90-98.)   Ms. Cress acknowledged seeing custodians mopping the hospital's floors on at least two occasions that day, admitted to seeing custodians in the service hallway on November 14, 2020, and conceded she did not know, either way, whether she and Ms. Plough passed a custodian mopping in the service hallway shortly before Ms. Plough's fall. (*See* Cress Dep. 47-48, 99-101.)   Sergeant King confirmed that any person mopping in Nationwide's service hallway would be an employee of the hospital. (King Dep. at 18-21.)   He also confirmed that custodians responsible for mopping the hospital's floors wear uniforms and use rolling carts with buckets mounted on the carts. (King Dep. at 19-21.)

{¶ 43} Ms. Plough described the properties she observed of the substance on the floor and transferred to her scrubs ("slick" and "oily") and opined that it appeared to be "like cleaning fluids" or "mop water." (Amy Plough Dep. at 112-15.)   When her husband came into contact with the dried substance on Ms. Plough's scrubs, he believed, based on its appearance and smell, it was dried soap water. (Joel Plough Dep. at 23, 58-60.)   As for Ms. Cress—who admittedly made no effort at the time of the fall to ascertain what the slick substance was (Cress Dep. at 58-59)—she described the substance Ms. Plough slipped on as "brown" and "slushy" and "thick," which is not inconsistent with the expected appearance of water used to clean floors. (*See, e.g.*, Cress Dep. at 58-63, 67-69.)   Ms. Cress also described receiving a text from Ms. Plough a few days after the incident reflecting Ms. Plough's suspicion that the substance she slipped on may have been mop water. (Cress Dep. at 97-99.)   Nationwide did not present any evidence that disproved that theory.

{¶ 44} True, there is no evidence of anyone besides Ms. Cress and Ms. Plough seeing the substance on the floor.  And we recognize that their versions of events differ in several respects.  Nonetheless, it remains that no evidence offered by Nationwide directly refuted the possibility that a Nationwide employee was responsible for the substance on which Ms. Plough slipped.  Indeed, much of the evidence presented in fact ***eliminated*** the possibility of other potential sources for it.

{¶ 45} The testimony of Ms. Plough, Ms. Cress, and Sergeant King all discounted any notion that the slick substance on the floor was ice, slush, or salt that had been tracked in from outside. Most notably, Sergeant King stated there were no exterior doors close to the area where Ms. Plough fell. (King Dep. at 11-12.) Both Ms. Plough and Ms. Cress stated the substance was not frozen (Amy Plough Dep. at 117-23; Cress Dep. at 57-59, 101-02) and did not appear to have salt particles in it (Amy Plough Dep. at 166-67; Cress Dep. at 101).

{¶ 46} Moreover, no evidence suggested the substance was a liquid from a spilled beverage or a plumbing leak. In fact, Ms. Cress and Ms. Plough explicitly disclaimed that the substance on the floor was a puddle and neither detected any identifiable odor emanating from it. (*See* Cress Dep. at 58-59; Amy Plough Dep. at 113-15.) Ms. Plough described the substance as film-like (Amy Plough Dep. at 115) and Ms. Cress's recollection that the substance was "thick" with varying density (*see* Cress Dep. at 57-59, 92) corroborated that the substance on which Ms. Plough slipped was not a puddle.

{¶ 47} Most notably, the service hallway where Ms. Plough fell was only accessible to Nationwide employees. (King Dep. at 9-11, 17; Amy Plough Dep. at 101-02; Cress Dep. at 46, 105.) And in the absence of evidence suggesting otherwise, there is no basis to conclude the actions of a patient or a member of the public could have caused the substance to accumulate on the service hallway's floor. Thus, "unlike in most premises-liability cases—where the store aisle, parking lot, or sidewalk containing a slip-and-fall hazard is generally accessible to the public—the hazardous area in this case was accessible to only a limited number of people." *See*, *e.g.*, *Meredith*, 2024-Ohio-4466 at ¶ 32.

{¶ 48} The security team at Nationwide tasked with investigating this incident did not obtain any information regarding the source of the substance or otherwise refuting Ms. Plough's account. Ms. Cress took Ms. Cheng to the area where Ms. Plough slipped approximately two hours later so Ms. Cheng could include the location in the incident report, but the slick substance was no longer there at that time. (Cress Dep. at 75-76, 104-05. *See also* King Dep. at 15-16.) Because of the placement and limited coverage of Nationwide's surveillance cameras, Sergeant King stated most events occurring in the long and winding ground floor service hallway—and particularly the area where Ms. Plough fell—were not captured on video. (*See* King Dep. at 6-12.) And this footage was

permanently deleted two weeks after the incident, per Nationwide's standard preservation policy at the time. (King Dep. at 22.)

{¶ 49} Although Ms. Plough and Ms. Cress described reporting the substance on the floor to multiple people—the cashier in the cafeteria (*see* Amy Plough Dep. at 112), the male employee in the gray uniform Ms. Cress recalled giving them directions (Cress Dep. at 64-65), and their clinical instructor, Ms. Cheng (*see, e.g.*, Cress Dep. at 63-64; Amy Plough Dep. at 123, 143)—Sergeant King did not interview Ms. Plough, Ms. Cress, or any other potential witnesses about the incident. (King Dep. at 13, 19-20.) And, after Ms. Plough submitted the incident report to Ms. Cheng on November 14, 2020, she did not meet or talk with anyone from Nationwide about the incident. (Amy Plough Dep. at 151-52.)

{¶ 50} Viewing this evidence in the light most favorable to Ms. Plough, we conclude Ms. Plough's unrefuted deposition testimony reasonably supports an inference that the liquid she slipped on was from the mopping performed by a Nationwide employee. Construing this inference in the light most favorable to Ms. Plough—as is our role at the summary judgment stage, *see Thompson*, 2011-Ohio-2270 at ¶ 16; *Smathers*, 2022-Ohio-4595 at ¶ 32—and given the inconclusive evidence and factual ambiguity regarding how the slick substance got onto the floor, it cannot be conclusively said that employees of Nationwide did not act negligently in causing a slick substance to accumulate in the service hallway where Ms. Plough slipped and fell. While Ms. Plough may not have direct evidence that Nationwide's employee created the hazard, sufficient circumstantial evidence exists to create a genuine issue of material fact. Moreover, this is not a matter of an inference upon an inference but, instead, two separate inferences drawn from the evidence: one from the fact that Ms. Plough saw an actively mopping employee who was coming from the direction of the slick substance shortly before she fell (thus suggesting the employee had mopped in the area where Ms. Plough fell), and the second from deposition testimony of Ms. Plough, Ms. Cress, and Sergeant King regarding the appearance and location of the hazard (consistent with Ms. Plough's belief it came from a Nationwide employee cleaning the service hallway's floors and eliminating the possibility of other sources of the substance).

{¶ 51} Thus, the trial court erred in finding there was no evidence that the actions of Nationwide's employee led to the slick substance being on the floor. Rather, there was a factual issue as to whether the mopping by a Nationwide employee created the hazard Ms.

Plough slipped and fell on, proximately causing her injuries. Appellants' first and second assignments of error are interrelated, inasmuch as the only reason the trial court found no duty was that it found appellants could not prove Nationwide's employee put the slick substance on the floor. For these reasons, we sustain appellants' first and second assignments of error.

{¶ 52} Nationwide also argued in their motion for summary judgment that there were no attendant circumstances that would create a genuine issue of material fact as to whether the slick substance on the floor was open and obvious. However, the trial court did not address those arguments when it granted summary judgment in favor of the hospital. Due to our role as a reviewing court, we cannot determine the merits of an argument in the first instance. *See, e.g., State v. Atchley*, 10th Dist. No. 07AP-412, 2007-Ohio-7009, ¶ 9 ("To address [these] argument[s] for the first time at this stage of the proceedings would be for this court to act as the trial court rather than as an appellate court."). As such, we decline to resolve this legal issue in the first instance. We, therefore, must remand the matter for the trial court to consider, in the first instance, whether the slick substance was open and obvious as a matter of law. Appellants' third assignment of error is overruled on that basis.

{¶ 53} In their fourth assignment of error, appellants contend the trial court "applied the wrong legal standard when it stated that [appellants] failed to present 'convincing, undisputed evidence' of negligence." (Brief of Appellants at 20.) Appellants' argument pertains to the trial court's finding that Nationwide met its "initial burden by presenting the Court with convincing, undisputed evidence demonstrating [appellants'] inability to meet the test of establishing [Nationwide's] negligence." (Apr. 25, 2024 Jgmt. Entry at 4.) Our disposition of appellants' first and second assignments of error, however, renders moot the arguments appellants present in support of their fourth assignment of error. Thus, pursuant to Civ.R. 12(A)(1)(c), we decline to address them.

## III. CONCLUSION

{¶ 54} Having sustained appellants' first and second assignments of error, overruled appellants' third assignment of error, and rendered appellants' fourth assignment of error moot, we reverse the April 25, 2024 judgment of the Franklin County Court of Common

Pleas and remand this matter to the trial court for further proceedings consistent with this decision.

*Judgment reversed; cause remanded.*

DORRIAN and JAMISON, JJ., concur.

———————————